311 Ga. 67
FINAL COPY

S21Y0378.  IN THE MATTER OF WILLIE GEORGE DAVIS, JR.

PER CURIAM.

This disciplinary matter is before the Court on the report and recommendation issued by Special Master Delia T. Crouch, which recommends that this Court accept the petition for voluntary discipline filed by Willie George Davis, Jr. (State Bar No. 213371) after the issuance of a formal complaint against him.  See Bar Rule 4-227 (c) (5).  The Special Master recommends that Davis, who has been a member of the State Bar since 1996, be suspended from the practice of law for 18 months with conditions for reinstatement, to be converted automatically to an indefinite suspension with the same conditions if he fails to comply with the conditions for more than 60 days after the 18-month period expires, based on his admitted violations of Rules 1.7 (b), 1.15 (I) (a) and (c), 3.5 (d), 8.1, and 8.4 (a) (5) of the Georgia Rules of Professional Conduct found in Bar Rule 4-102 (d).  This matter stems from Davis's mishandling of

his sister's estate and his nephew's conservatorship and his repeated failure to comply with orders of the Cobb County Probate Court. Although the State Bar and Davis did not file exceptions to the Special Master's report, we reject the requested sanction for the reasons stated below.[1]

1. *The Facts.*

As recounted by the Special Master, the undisputed facts show the following. In 2012, Davis drafted a will for his sister, naming himself as the executor of her estate, the guardian of his nephew, and the conservator of his nephew's funds. The will specifically

---

[1] The record shows that the grievance investigated by the State Disciplinary Board in this matter was based on a letter from the Cobb County Probate Court to the State Bar outlining Davis's conduct in a probate proceeding. Davis initially failed to respond to the Notice of Investigation, which resulted in an interim suspension pursuant to Bar Rule 4-204.3 (d) that was lifted when he responded to the State Bar. The Investigative Panel of the Board then found probable cause to charge Davis with a number of rule violations, and the State Bar filed a Formal Complaint and Petition for Appointment of Special Master. This Court issued an order appointing the Special Master, and Davis filed an answer to the Formal Complaint in which he admitted some of the Board's factual allegations, but denied others. Davis and the State Bar engaged in discovery and participated in a scheduling conference with the Special Master, and after negotiating with counsel for the State Bar, Davis filed his petition for voluntary discipline. The State Bar filed a response in support of the petition. The Special Master then filed the instant report.

excepted Davis from the requirements to post a fiduciary bond and to file inventories or annual returns with the probate court, and Davis did not obtain informed and written consent that his sister was aware of the potential conflict of interest in having him serve without bond as executor, conservator, and guardian pursuant to the will he drafted. Davis was not aware that his sister was suffering from breast cancer at the time he drafted her will, and she died shortly thereafter. The nephew was only 13 years old at the time of his mother's death and was the sole beneficiary of his mother's estate.

Davis filed a petition to admit the will to probate, and the probate court appointed him to serve without bond as executor, conservator, and guardian per the terms of the will. The nephew was named a beneficiary of his mother's life insurance policy, the proceeds of which were $157,277.48. Davis admitted that he received the funds and placed them in his IOLTA account instead of a conservator account. Moreover, although the Special Master found that Davis did eventually establish a conservator account and

"transferred the funds to that account," Davis failed to maintain, and could not produce, records of the funds held in the IOLTA account. He also received the nephew's Social Security benefit checks in trust as the nephew's custodian and conservator, but he did not keep records of those funds, either.

In October 2016, the nephew reached the age of majority (18), which terminated the testamentary conservatorship by law. Thereafter, the nephew and Davis had disagreements that led to Davis cutting off the nephew's cell phone service and making no further mortgage payments on his deceased sister's home, where the nephew had been residing.

In May 2017, the nephew, through counsel, filed a petition to suspend the conservatorship and to obtain a final settlement of accounts of the estate and the conservatorship. According to the probate court, "[a]n extensive procedural odyssey ensued . . . including multiple hearings, dozens of attempts to serve [Davis], findings of contempt against [Davis], and multiple orders of [Davis's] incarceration." First, the probate court entered an order suspending

4

Davis's letters of testamentary and issued a citation for him to appear and make an accounting of estate and conservatorship assets within 15 days. A deputy from the Fulton County Sheriff's Office then personally served Davis with the probate court's order and citation. Davis, however, did not make any accounting or appear at the hearing because he "simply could not handle the emotion which welled up. [He] was in denial and could not address the court proceeding properly." He explained that, beginning in 2016, he experienced a series of family deaths and life changes that impacted him severely and that he failed to address right away. In 2017, during the time of these proceedings, his primary care physician prescribed him medication for depression and anxiety, but he failed to seek counseling as his physician directed him to do. He also did not notify his nephew's counsel or the probate court about his mental illness or seek any relief from the probate court's requirements on that basis.

In June 2017, the probate court issued another order directing Davis to file the accountings, and the court set the matter for

5

another hearing. But Davis did not file the accountings or appear in court, and the probate court issued another order for Davis to appear, to present the accountings, and to show cause why he should not be held in contempt. The probate court then entered an interim judgment against Davis in the amount of $157,227.58, the amount of the life insurance proceeds for which he had not accounted, and attorney fees in the amount of $11,891. Approximately one month before that order was issued, Davis delivered a check to his nephew's attorney in the amount of $34,025.80, which was the amount that remained in the conservatorship account. But Davis still did not respond to the probate court's "requests for personal service of the court's notices and demands," which resulted in the probate court directing service by publication. Davis admitted that he was not opening correspondence from the probate court during this time due to his declining mental state, and after he failed to appear at yet another hearing, the probate court issued a bench warrant for his arrest and issued an order finding him in contempt. Davis eventually turned himself in to jail in January 2018.

Following a hearing, the probate court entered a criminal contempt finding, sentencing Davis to 20 days in jail with credit for time served, and to pay a fine of $500; the probate court also entered a civil contempt finding, sentencing Davis to remain incarcerated and pay a fine of $100 per day until such time as he purged his contempt by filing accountings of the estate and conservatorship. Because Davis "had been unable to put together anything remotely [responsive] to the court's demand" while incarcerated, and because he had not been given his medication while in custody, the judge released Davis to allow him to get back on his medication, to gather the records of the conservatorship and estate, and to file the accountings in advance of a hearing in March 2018. The judge also awarded the nephew additional attorney fees. At two hearings, Davis presented some documentation of his activities and expenditures on behalf of the estate and conservatorship, as well as an inventory of the estate and its annual returns, but failed to include complete bank statements for the custodial account or any statements for an account for the estate. After considering that

evidence, the probate court issued a judgment against Davis in favor of his nephew in an amount of $9,971 for breaches related to the estate and in the amount of $190,043.48 for breaches related to the conservatorship.

Following the judgment, Davis failed adequately to respond to his nephew's post-judgment requests, which caused the probate court to grant the nephew's motion to compel and request for attorney fees for having to file the motion. Davis then failed to respond to the requests within the time set forth in the order granting the motion to compel, which caused him to be held in contempt and subject to additional attorney fees. Davis admitted that, including amounts due for the attorney fees judgments, but not including any statutory interest, the amount of money he still owed to his nephew was $193,174.91.

2. *Rule Violations.*

As summarized by the Special Master, based on this conduct, Davis admitted in his petition for voluntary discipline that he violated Rules 1.7 (b), 1.15 (I) (a) and (c), 3.5 (d), 8.1, and 8.4 (a) (5).

8

The maximum sanction for a violation of each of these rules is disbarment, except for Rule 3.5 (d), for which the maximum sanction is a public reprimand.

Specifically, Davis admitted that he violated Rule 1.7 (b)[2] by failing to obtain informed consent confirmed in writing that his sister was aware of a potential conflict of interest in naming himself executor in her will; that he violated Rule 1.15 (I) (a)[3] by depositing the insurance proceeds from his sister's life insurance policy in his

---

[2] Rule 1.7 (b) provides:
If client informed consent is permissible a lawyer may represent a client notwithstanding a significant risk of material and adverse effect if each affected client or former client gives informed consent, confirmed in writing, to the representation after:
  (1)  consultation with the lawyer, pursuant to Rule 1.0 (c);
  (2) having received in writing reasonable and adequate information about the material risks of and reasonable available alternatives to the representation; and
  (3) having been given the opportunity to consult with independent counsel.

[3] Rule 1.15 (I) (a) provides:
A lawyer shall hold funds or other property of clients or third persons that are in a lawyer's possession in connection with a representation separate from the lawyer's own funds or other property. . . . Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of six years after termination of the representation.

IOLTA account and failing to maintain accurate records; and that

he violated Rule 1.15 (I) (c)[4] by failing to account for and deliver

funds held in his IOLTA account. In addition, Davis admitted that

he violated Rule 3.5 (d)[5] by failing to participate in the probate

proceedings, thereby causing a disruption in the administration of

justice. He also admitted that he violated Rule 8.1[6] by failing to

respond to a demand for information from the State Bar, and that

he violated Rule 8.4 (a) (5)[7] by violating fiduciary duties to account

---

[4] Rule 1.15 (I) (c) provides:
Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

[5] Rule 3.5 (d) provides that "[a] lawyer shall not, without regard to whether the lawyer represents a client in the matter . . . engage in conduct intended to disrupt a tribunal."

[6] Rule 8.1 provides, in pertinent part, that "a lawyer in connection with a . . . disciplinary matter, shall not . . . (b) . . . fail to respond to a lawful demand for information from . . . [a] disciplinary authority[.]"

[7] Rule 8.4 (a) (5) provides:

for funds held in trust (i.e., the money collected by him and held in his IOLTA account), which formed the basis of the judgment against him for his nephew. The Special Master, having reviewed the probate court's orders in light of the facts of this case, as well as Davis's statements and admissions, found by clear and convincing evidence that Davis committed these acts and the violations alleged.

3. *Special Master's Recommendation of Discipline.*

(a) *Aggravating and mitigating factors.* The Special Master looked to the ABA Standards for Imposing Lawyer Sanctions for guidance in determining the appropriate punishment for Davis's misconduct, see *In the Matter of Morse*, 266 Ga. 652, 653 (470 SE2d 232) (1996), and found that Davis correctly noted in his petition that under the ABA Standards, in imposing a sanction for a lawyer's misconduct, the court should consider the duty violated, the lawyer's

---

It shall be a violation of the Georgia Rules of Professional Conduct for a lawyer to: . . . fail to pay any final judgment or rule absolute rendered against such lawyer for money collected by him or her as a lawyer within ten days after the time appointed in the order or judgment[.]

mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors. See ABA Standard 3.0. As for the duties violated, the Special Master found by clear and convincing evidence that Davis failed to preserve his nephew's property, see ABA Standard 4.1; that he failed to avoid the conflict of interest inherent in drafting a will that allowed him to serve, without bond, as executor, conservator, and guardian, see ABA Standard 4.3; that he showed a lack of diligence in handling his nephew's affairs both before and after his nephew reached the age of majority, see ABA Standard 4.4; that he showed a lack of competence in handling his nephew's affairs, see ABA Standard 4.5; that he showed deception and lack of candor to his nephew, his nephew's attorney, the probate court, and the State Bar regarding the status of his nephew's property, see ABA Standard 4.6; that he violated duties owed to the probate court when he withheld material information regarding the status of the estate and conservatorship, see ABA Standard 6.1; and that he violated duties owed to the probate court when he unnecessarily delayed the

progress of his nephew's efforts to get an accounting of the money that had been entrusted to him, see ABA Standard 6.2.

As to Davis's mental state, the Special Master found that it was affected by Davis's grief and his partially untreated depression and anxiety. The Special Master noted that Davis claimed that he was only negligent. The Special Master determined, however, that Davis's failure adequately to explain what happened to the funds he held for his nephew appeared to be deliberate because he did not seek assistance to perform the thorough accounting required to exonerate himself, and because while he appeared to be saying that he did not steal his nephew's money and convert it to his own use, he acknowledged that he could not establish that he used all of the money entrusted to him on the nephew's expenses. On the other hand, the Special Master determined that Davis acknowledged that he was legally responsible to his nephew for the amount of the probate court's judgments (and appeared to be making payments of $300 per month toward the judgments), and affirmatively stated that he could not pay the judgments because the life insurance

13

proceeds and Social Security benefits had been spent. The Special Master thus found that Davis was not dishonest in all of his violations, nor was he merely negligent as to all of his violations.

The Special Master found that the factors in aggravation as cited by the State Bar in its response to Davis's petition were supported by clear and convincing evidence. Specifically, the Special Master stated that Davis had prior disciplinary offenses, including an Investigative Panel reprimand in April 2014 and a formal letter of admonition in October 2016. See ABA Standard 9.22 (a). In addition, he admitted violating no less than five rules over the course of several years, see ABA Standard 9.22 (d); he admitted facts that supported the conclusion that he obstructed the disciplinary proceeding by failing to respond to the State Bar's demands for information, see ABA Standard 9.22 (e); he committed the offenses against a vulnerable victim — his minor nephew, who had been orphaned at the age of 13, see ABA Standard 9.22 (h); and he had substantial experience in the practice of law, see ABA Standard 9.22 (i).

Finally, while the State Bar had found that Davis's failure to comply with his nephew's attorney's post-judgment discovery requests showed an indifference to making restitution, see ABA Standard 9.22 (j), the Special Master concluded that this did not necessarily justify a finding of this aggravating factor because of the undisputed mental health factors that "crippled" Davis for a period of time and because Davis did begin to pay $300 per month toward the balance owed. See ABA Standard 9.4 (a).

As for the mitigating factors, the Special Master concluded that only three of the mitigating factors Davis cited were supported by the evidence. As to the first two factors, the Special Master determined that Davis had personal and emotional problems, including difficulty dealing with the deaths of his family members and grief that affected his practice and judgment, see ABA Standard 9.32 (c), and that he had established a mental disability or impairment based on his partially untreated depression and anxiety, which played a significant role in his misconduct, see ABA Standard 9.32 (i). As a third factor, the Special Master determined

that Davis's various leadership positions justified a finding of his positive character and reputation, at least in the context of his children's schools, where he reported that he tutored students, volunteered as a career-day speaker, and served in various offices. See ABA Standard 9.32 (g).

(b) *Level of proposed discipline.* In his petition, Davis requested that he be suspended for a period of 18 months with conditions for reinstatement, or in the alternative, a period of 18 months up to but not exceeding three years with conditions. The proposed conditions included that he provide the State Bar with certification from a licensed mental health professional that he was fit to practice law, see *In the Matter of Moore*, 305 Ga. 419, 421 (825 SE2d 225) (2019), and proof that he satisfied the judgment issued by the probate court in favor of his nephew and his nephew's attorney, see *In the Matter of Judah*, 282 Ga. 55, 55 (644 SE2d 858) (2007). Following negotiation with Davis's counsel, the State Bar agreed that an 18-month suspension with conditions was appropriate under these circumstances. See *In the Matter of Brock*,

16

306 Ga. 388, 388 (830 SE2d 736) (2019).

Among other things, the Special Master concluded that Davis did not maintain and had not provided any records of how much of his nephew's funds he spent for the benefit of his nephew, such that the record showed only that the money was unaccounted for, not necessarily that Davis converted it and used it for his own purposes; and that, indeed, the State Bar acknowledged that it might have difficulty showing precisely how much of the judgment was attributable to negligence, emotional problems, anxiety, and stress, as opposed to nefarious reasons.

In addition, the Special Master recognized that in *In the Matter of Henderson*, 289 Ga. 135 (710 SE2d 124) (2011), this Court had rejected a petition for voluntary discipline similar to the one at issue, holding that it would not "entertain the petition" requiring a one-year suspension instead of disbarment until Henderson had made the final disbursements owing to his clients from his trust account. Id. at 136. However, the Special Master determined that Davis's case was distinguishable because, in *Henderson*, the evidence was

uncontested that Henderson had converted $28,028 to his own use, whereas here, the State Bar conceded that it may have difficulty establishing precisely what portions of the nephew's unaccounted-for money, if any, was unlawfully converted to Davis's own use. See ABA Standard 4.12 ("Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client."); *In the Matter of Anderson*, 286 Ga. 137, 140-141 (685 SE2d 711) (2009) (disbarring a lawyer who had two prior disciplinary sanctions, noting the Court was less troubled by the lawyer's failure to properly supervise employees who negligently handled real estate closing funds than by the lawyer's intentional and bad faith conduct in paying himself funds from one transaction contrary to escrow agreement). But see ABA Standard 4.11 ("Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.").

Ultimately, the Special Master concluded that, if Davis could prove that he had paid all of the money due and that he was no

18

longer suffering from any mental disability that would make him unfit to practice law, then he should be permitted to be reinstated to practice so long as he served a total suspension of at least 18 months. The Special Master concluded that if Davis were never able to satisfy those conditions, the greater public would be protected by Davis remaining indefinitely suspended. Therefore, the Special Master further recommended that if Davis failed to meet the above conditions for more than 60 days after the 18 months expired, then the time-limited suspension would be converted automatically to an indefinite suspension under the same conditions, so that Davis's nephew could seek relief for his loss under the Clients' Security Fund. See Bar Rule 10-101.[8]

4. *Analysis and Conclusion.*

After a careful consideration of the record, the Court concludes

---

[8] The Special Master further noted that, were the nephew to submit a claim to the fund and receive compensation, Davis would be required to make restitution to the Fund for the amount of the compensation paid by the Fund prior to seeking reinstatement, see Bar Rule 10-109 (c), and the amount Davis would be required to pay to his nephew would only be offset to the extent that his nephew received compensation under the Fund, see Bar Rule 10-109 (b).

that the discipline recommended by the Special Master, even though not opposed by the State Bar, is unacceptable in this case. As an initial matter, the Special Master's recommendation to impose an indefinite suspension until the reinstatement conditions are met would effectively result in Davis being suspended for approximately 50 years if he continued paying restitution at the rate the record shows he is currently paying. However, this Court does not allow suspensions of that length. See *In the Matter of Briley-Holmes*, 304 Ga. 199, 207-208 (815 SE2d 59) (2018) (concluding that recommended five-year suspension with conditions on reinstatement was unacceptable and noting that, with one exception, this Court has never imposed a suspension of that length outside the reciprocal discipline context, and that the exception was in a case decided before this Court first said that it would look to the ABA Standards for general guidance in determining the appropriate level of discipline, which provide that suspensions should not be for more than three years).

Second, although the Special Master contends that the level of

recommended discipline could improve the chances that Davis's nephew is made whole, insofar as it would not permit reinstatement until Davis finished paying restitution to his nephew, this Court must also take into consideration other important purposes of disciplinary proceedings, such as "protect[ing] the public from attorneys who are not qualified to practice law due to incompetence or unprofessional conduct" and "protect[ing] the public's confidence in the legal system." *In the Matter of Fry*, 302 Ga. 370, 371 (806 SE2d 604) (2017) (citation and punctuation omitted). An overly long suspension — with reinstatement hinging only on the proposed conditions — would not serve those purposes. A suspension is a separation from the practice of law. After an extended period, it is important that a lawyer is not reinstated without ensuring his character and competence at that time. This is why lawyers who are disbarred may apply for readmission after five years and may practice again only after obtaining a new certification of fitness and again passing the Georgia Bar Examination. See Rules Governing Admission to the Practice of Law, Part A, Section 10; *In the Matter*

21

*of Richards*, 296 Ga. 441, 443 (768 SE2d 518) (2015). In this way, the reinstatement conditions recommended by the Special Master for Davis are considerably less stringent than for disbarred attorneys, insofar as Davis could remain suspended for far longer than five years but — upon satisfying the conditions of his suspension — not be required to re-certify his fitness before he resumes the practice of law. At the same time, the recommended conditions are in some ways more punitive to Davis. Given the large discrepancy between the amount he would be required to repay and his current rate of repayment, the recommended conditions could place Davis in a disciplinary purgatory: if he cannot finish paying restitution, his discipline will be endless. For all these reasons, the Court rejects Davis's petition for voluntary discipline.

5. *Motion to File Amicus Curiae Brief.*

Finally, Davis's nephew has filed a "Motion for Leave to File Amicus Curiae Brief," see Supreme Court Rule 23, in which he seeks to make the Court aware of the impact that Davis's wrongdoing has had upon him, and to offer his thoughts on Davis's recommended

level of discipline. The State Bar opposed the nephew's motion. We have now rejected Davis's petition for voluntary discipline, but Davis's nephew may file a similar motion in the underlying disciplinary case (State Disciplinary Board Docket No. 7194), and if he does so, the Special Master should allow the filing of the proposed brief. See Commentary to ABA Standard 9.4 (a) (1992) ("Although the court should not consider the complainant's recommendation as to sanction, the complainant's feelings about the lawyer's misconduct need not be completely ignored. The complainant's views will be relevant and important in determining the amount of injury caused by the lawyer's misconduct, a factor which can be either aggravating . . . or mitigating . . . ."). See also *In the Matter of Adams*, 291 Ga. 768, 769 (732 SE2d 446) (2012) (noting interested parties' letters submitted to this Court, both in support of and opposition to attorney's petition for voluntary discipline).

*Petition for voluntary discipline rejected. All the Justices concur, except Melton, C. J., who concurs in the judgment only.*

23

Decided March 1, 2021.

Petition for voluntary discipline.

*Gene Chapman*, for Davis.

*Paula J. Frederick, General Counsel State Bar, William D. NeSmith III, Deputy General Counsel State Bar, Jenny K. Mittelman, James S. Lewis, Assistant General Counsel State Bar,* for State Bar of Georgia.